## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION   :    CASE NO. _____
OF THE UNITED STATES OF AMERICA   :
FOR A SEARCH WARRANT FOR A 2014   :
CHEVROLET SUBURBAN, MD LICENSE   :
2BP1889, VIN#1GNSKJE70ER228461   :    UNDER SEAL

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Charles Rooney, being duly sworn, depose and state as follows:

1.    I am an "investigative or law enforcement officer of the United States" empowered to make arrests within the meaning of Section 3052 Title 18, United States Code and to conduct search warrants and seizures within the meaning of Section 3107 Title 18, United States Code for offenses in which the United States Government is a party of interest.

2.    I am a duly appointed Special Agent of the Federal Bureau of  Investigation (FBI) and have been employed as such since 2008.  I am currently assigned to a squad, which investigates Violent Crimes out of the FBI's Violent Crimes Task Force of the Washington, D.C. Field Office.  Prior to being appointed to the FBI, I was employed as a Police Officer from 2000 through 2008 with the Fairfax County Police Department, Fairfax, VA.   During the course of my participation in law enforcement I have conducted arrests, obtained search warrants and court orders.  I have investigated crimes involving bank robberies, armored car robberies, assaults, malicious wounding and carjacking, which have resulted in arrests and convictions.

3.    This affidavit is submitted in support of a warrant to search a vehicle located at 2800 V Street Section C, Northeast, Washington, D.C., more fully described in attachment A. The warrant seeks to obtain further evidence that THOMAS ANTHONY GEORGE, and others, committed bank robbery in violation of 18 U.S.C. § 2113, and used, carried, a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c).  *See* Attachment B.

4.      The facts and information contained in this affidavit are based upon my training and experience, participation in investigations, personal knowledge and observations during the course of this investigation, as well as the observations of other agents and police officers involved in this investigation.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of records, documents and other physical evidence obtained during the course of this investigation.  This affidavit contains information necessary to support probable cause.  It is not intended to include each and every fact and matter observed by me or known to the United States.

5.      Based on my experience and training, I am aware that:

a.      Those involved in criminal activities commonly maintain at their residences, vehicles, and on their property, tools and other implements they used during or in furtherance of the commission of crime.

b.      Those involved in criminal activities commonly maintain at their residences, vehicles, and on their property, books, records, receipts, computer diskettes, computers, notes, ledgers, airline tickets, money orders, and other papers and electronic records relating to their criminal activities.

c.      Those involved in criminal activities commonly maintain books, papers, documents, and electronic records in secure locations within their residences and their property, so they can have ready access to such information.

d.      Those involved in criminal activities attempt to legitimize the proceeds from their criminal activities.  They often accomplish this by using the services of foreign and domestic banks and various financial institutions, and real estate brokers.  Books and papers relating to such efforts, including but not limited to, cashier checks, money orders, telegrams,

letters of credit and ledgers, are maintained in the residences and on the property of those involved in criminal activities.

e.     Those involved in criminal activities take, or cause to be taken, photographs of themselves, their associates, property derived from their criminal activities, and their products, including with cellular telephones, and that such photographs are often kept in their residences or stored in electronic format on computers and computer thumb drives.

f.     Those involved in criminal activities very often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies and continue to use these assets and to exercise dominion and control over them even though the assets are normally owned by them.

g.     Those involved in criminal activities usually have in their possession weapons.  These weapons often consist of knives, guns, rifles, pistols, revolvers, shotguns, assault-type weapons, and other firearms as well as ammunition for any handgun, shotgun, and/or rifles.  They possess these items for protection against robbery and also for use during and in furtherance of the commission of criminal offenses.

5.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

b.      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

d.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

## BACKGROUND OF INVESTIGATION

Since January 2015, the Washington Field Office of the FBI, the Fairfax County and Vienna Police Departments, the Loudon County Sheriff's Office, Charles County Sheriff's Office, and Metropolitan Police Department, have been conducting a criminal investigation involving a series of nine armed bank robberies in the Eastern District of Virginia, District of Maryland and District of Columbia.   All of these robberies have occurred within a span of approximately three months, beginning in January 2015.

## ARREST OF THOMAS GEORGE AND DAWITT HALL

On March 13, 2015, at approximately 2:23 p.m., a subject later identified as Thomas Anthony George entered the Wells Fargo Bank located at 4302 Connecticut Ave, NW, Washington, D.C.  George was dressed in a blue colored jacket, sunglasses, gloves, and a mask. George was brandishing a black handgun and he approached a bank teller.  George stated "Give me money or I'm going to kill a customer".   George stated this three times.   George was provided money by the bank teller who was in fear for his/her life and the lives of others in the bank .   The loss to the bank was $9,178 federally insured, United States Currency.   The robbery was captured on the bank's surveillance cameras.

George exited the bank and was seen by a law enforcement officer entering the passenger side of a black colored Chevrolet Suburban with one Maryland license plate on the rear of the vehicle.  This vehicle was parked a short distance from the bank, but in a location that was not readily visible to persons inside bank.   A witness described the driver of the Suburban as a black male wearing a black or dark colored jacket.

Approximately thirty minutes later, a black colored Chevrolet Suburban with one Maryland license plate on its rear bumper was observed by law enforcement in the vicinity of

1953 19th Place, SE, Washington, D.C.  (Generally, without heavy traffic, it takes approximately 25 minutes to reach 1953 19th Place, SE, from 4302 Connecticut Avenue, N.W.).  George and a subject later identified as Dawitt Hall were seen exiting the vehicle and entering 1953 19th Place, SE, Washington, D.C.  Hall was driving and George exited the passenger side of the vehicle.

A short while later, George was observed exiting 1953 19th Place, SE, Washington, D.C. going to the Chevrolet Suburban which was parked in the rear of the building.  Law enforcement detained George.   Law enforcement agents observed in plain view in the front seat of the Chevrolet Suburban a blue colored jacket and sunglasses that matched the items worn during the bank robbery.   George was taken into custody.   Search incident to arrest had George in possession of $3,950 U.S. Currency in his pants pocket.

The law enforcement officer who observed the black Chevrolet Suburban with Maryland license plate immediately after the bank robbery later observed the vehicle parked in the vicinity of 1953 19th Place, SE, Washington, D.C.   That officer advised it appeared to be the same vehicle he had seen leaving the bank earlier.

On March 13, 2015, a search warrant was obtained and executed at 1953 19th Place, SE, Apartment 105, Washington, D.C.  During the search a black handgun was seized.  Agents also seized the black Chevrolet Suburban described in this Affidavit.

George was taken to Washington D.C. Metropolitan Police Department and was advised of his rights.  Defendant George waived his rights and admitted to robbing the Wells Fargo Bank located at 4302 Connecticut Ave., NW, Washington, D.C., as well as the other eight banks in Virginia and Maryland outlined briefly:

## JANUARY 2, 2015 ROBBERY IN MCLEAN, VIRGINIA

On January 2, 2015, at approximately 10:50 AM, a suspect entered the Bank of America, 1369 Chain Bridge Road, McLean, Virginia, brandished a weapon and robbed the bank.  The suspect was wearing a fake beard/mustache facial disguise.  He was described as a white male, approximately 50 years old, approximately 5' 10", approximately 170 lbs, unshaven and wearing a black felt hat, black trench coat, black gloves,  light colored pants, and white sneakers.  Upon entering the bank, the suspect immediately pointed a black semi-automatic handgun at the bank tellers and instructed them to "Give me the fucking money." The suspect placed the money in blue plastic bag and exited the bank.  The suspect was observed exiting the bank and walking north east direction towards Brawner Street and Calder Road. The total loss to the bank was $28,314.

## JANUARY 16, 2015 ROBBERY IN FAIRFAX, VIRGINIA

On January 16, 2015, at approximately 3:17 PM, two suspects, wearing facial disguises, entered the BB&T BANK, located 8416 Arlington, Boulevard, Fairfax, Virginia, brandished a weapon and robbed the bank.   Suspect 1 was described as a White, male, approximately 30-40 years old, approximately 5'11" - 6', approximately 200-230 lbs, with a big nose with rough bumps or acne scars, wearing a black hat, black mask, dark gloves, dark sunglasses, black trench coat.  Suspect 2 was described as male, unknown race, wearing a black hat, black mask, dark gloves,  dark colored pants, dark gloves.

 Upon entering the bank Suspect 1 pointed a black semi-automatic handgun at the bank tellers and customers. Suspect 1demanded the door to the teller stations be opened.  Once behind the teller counter, Suspect 1 ordered a teller to place money into a brown plastic bag.

The suspects fled on foot and entered a parking garage located behind the bank.  The total loss to the bank was $5,847.48.

## JANUARY 20, 2015 ROBBERY IN VIENNA, VIRGINIA

On January 20, 2015, at approximately 2:53 p.m., the Bank Of America located at 235 West Maple Avenue, Vienna, Virginia was robbed by two unknown armed suspects, one wearing a black hat, black coat, black pants, black gloves, black and white shoes, a black and white scarf, sunglasses, and carrying a black semi-automatic pistol. The other suspect was wearing a black hat, a face covering, a tan jacket, black pants, black gloves and carrying black semi-automatic pistol.

The suspects entered the bank and pointed their guns at the employees and customers and had them all get on the ground.  One of the suspects went to several teller stations getting cash from the top and bottom drawers.  The bank reported the suspect received $47,491.00 before departing the bank and fleeing to the parking lot where the dye packs exploded.  Recovered in the parking lot was $47,330.00

## JANUARY 30, 2015 ROBBERY IN ARNOLD, MARYLAND

On January 30, 2015, at approximately 1:07pm, two white males entered the Essex Bank located at 1460 Ritchie Highway, Arnold, Maryland, both brandishing pistols. The first male approached the teller window and began to yell, "Give me 50's, 100's from the second drawer!" The second male held the other employees at gunpoint while the first was at the teller line.

The teller then gave the first male $6,280 in US currency, who then put the money in a white bag which he produced from under his jacket. The two males then fled the bank on foot and ran in a north direction. The teller gave the robber a tracking device embedded in a pack of money, which did not function properly.

The first male was wearing a long black jacket, large brim black hat, and long, dark grey, fake beard. The second male was wearing a black "puffy" winter jacket, with the hood pulled up, and a dark mask which covered his mouth.

### FEBRUARY 5, 2015 ROBBERY IN WALDORF, MARYLAND

On February 5, 2015, at approximately 11:30am, a suspect entered the SunTrust Bank, located at 3070 Leonardtown Road, Waldorf, Maryland, and brandished a semiautomatic handgun. The suspect ordered the tellers to give him money from their teller drawers. After taking the money, the suspect fled. Witnesses described the suspect as a white, 5'10'' male, dressed in a long, dark overcoat, wide-rimmed black hat, sunglasses, and a large, fake beard.

### FEBRUARY 18, 2015 ROBBERIES IN STERLING, VIRGINIA

On or about February 18, 2015, two subjects robbed the BB&T Bank located at 440 Maple Avenue East, Vienna, Virginia, at approximately 3:12 p.m.

Also on or about February 18, 2015, two subjects then robbed the Wells Fargo Bank, a federally-insured financial institution, located at 47040 Community Plaza, Sterling, Virginia, within the Eastern District of Virginia at approximately 3:56 p.m. The subjects carried semi-automatic pistols and wore predominantly dark-colored clothing.

### MARCH 2, 2015 ROBBERY IN FALLS CHURCH, VIRGINIA

On March 02, 2015, at approximately 12:44 PM, two armed men  dressed in all dark clothing  walked into the Wells Fargo Bank, 1000 W. Broad Street, Falls Church, Virginia, demanded money and robbed the bank.

Suspect 1 was described as black, male, approximately 6', 210 - 220lbs, 30-36 years old with greyish teeth with gaps between each tooth and wearing a black knit hat with a soft brim, ski mask with eyes and mouth cut out, black and white scarf wrapped  around his neck, dingy

green puffy jacket, black jean carpenter style pants, possibly wearing white Air Jordan's, black knit gloves.

Suspect 2 was described as a white,  male, 5'10 - 5'11, stocky build, mid to late 50's years old with a missing bottom right front tooth. He was described as having a country accent possibly from West Virginia.  He was wearing a black stocking cap, black scarf wrapped around his mouth, black mid length wool coat, black pants and black gloves.

Suspect 1 pointed a black semi-automatic handgun at a bank employees and customers and ordered them to the ground.     Suspect 2 pointed a silver and grey semiautomatic handgun at customers and bank employees and ordered them to the ground.  The suspects forced the tellers to give them money.  At the conclusion of the robbery, the suspects fled on foot in an eastbound direction.  The total loss to the bank was $35,061.

Based on my training and experience, I know that robbers use GPS devices and maps to locate their robbery locations and cellular phones to communicate with fellow conspirators, and containers to store the proceeds of the robberies.   Individuals involved in robberies will also maintain notes or other documents which contain the names and contacts of their associates.  Sometimes, robbers take pictures of their fellow conspirators as well as money obtained during the course of the robberies.  I also know that sometimes robbers retain items used to facilitate the robberies as well as items taken during the robberies.   Sometimes, in addition to money, robbers also take receipts, other documents and items bearing the name of the commercial business.  I also know that individuals tend to retain their clothing, including the items worn in the robberies, for extended periods of time.  Robbers sometimes store proceeds and evidence of their crimes in their homes and/or vehicles.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found in the subject vehicle, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices. As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

*Probable Cause.* Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are found in the subject premises, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a.      Individuals who engage in criminal activities, including criminal conspiracies, use digital devices to communicate with co-conspirators online, but that they also store on computer hard drives and other electronic storage media documents and records relating to their illegal activity.  Online criminals store these documents and records, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer or a smart phone, the

data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

*Forensic Evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the subject premises because:

13

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.   Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.   Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.   Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or

absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

    f.  I know that when an individual uses a digital device to engage in criminal activities, including criminal conspiracies, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

   *Methods To Be Used To Search Digital Devices.* Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

    a.  Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be

necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain enormous amounts of data.

d.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular

17

data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

      e.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through

data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

    f.  Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    g.  Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only

inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

h.      In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      Upon securing the subject premises, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the premises.  The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the

markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

**CONCLUSION**

WHEREFORE, your Affiant submits that probable cause exists that the vehicle a 2014 black Chevrolet Suburban bearing Maryland registration 2BP1889 and Vehicle Identification Number 1GNSKJE70ER228461 located at 2800 V Street, Section C, Northeast, Washington, D.C., contains evidence, fruits, and instrumentalities of bank robbery as set forth more fully in Attachment B, in violation of 18 U.S.C. § 2113, and using, carrying, and a firearm during and in

relation to a crime of violence, in violation of 18 U.S.C. § 924(c).

Respectfully submitted,

_____
CHARLES ROONEY
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this _____ of March, 2015.

_____
ALAN KAY
UNITED STATES MAGISTRATE JUDGE